Filed 5/7/25  P. v. Montgomery CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

<table>
<tr><td>

THE PEOPLE,

    Plaintiff and Respondent,

v.

RYAN VINCENT MONTGOMERY,

    Defendant and Appellant.

</td><td>

H051993
(Monterey County
Super. Ct. No. 23CR001662)

</td></tr>
</table>

Defendant Ryan Vincent Montgomery challenges the trial court's denial of his request for mental health diversion. After his diversion request was denied, he pleaded no contest to various charges and was granted probation. He argues the court abused its discretion in denying diversion on the grounds that he would pose an unreasonable risk of danger to public safety if treated in the community, given that the conditions of defendant's probation would also require treatment in the community. Finding a valid waiver of appeal, and no abuse of discretion in any event, we will affirm the order denying his diversion request.

## I.  BACKGROUND

Our factual summary of the charges against defendant is based on the preliminary hearing transcript, which the trial court considered in ruling on the diversion request and which the parties rely on in their briefing.

### 1. Counts 1, 2, 3, 4, and 7

On January 4, 2023, a motorist reported being threatened by the driver of a white truck registered to defendant. The truck passed the victim's car on the highway, then "slammed on its brakes" and continued "brake checking" the car "for several minutes." The driver of the truck was honking his horn and "flipping off" the other driver. As the truck was exiting the highway, it pulled alongside the car. The car's driver and passenger looked at the truck and "saw a black handgun pointed directly at them out the driver[']s] window."

On January 31, 2023, another motorist reported being threatened by the driver of the same truck. According to the victim, the truck "was tailgating him and then went around him and got in front of him and brake checked him." The victim saw the driver of the truck "holding up a firearm, a pistol, in the back window, flashing it at him."

CHP officers obtained a warrant and searched defendant's home on February 1, 2023. They found and seized multiple guns, including an assault rifle, ammunition, and an extended magazine. On the same day, another CHP officer carried out a traffic stop of the white truck registered to defendant. Defendant was driving and there was an unregistered loaded handgun on the passenger seat.

Defendant later appeared at the CHP office several times. Defendant told the officer from the traffic stop that he wished he had pulled his gun out during the stop, so that the officer would have killed him. After defendant left the office, officers observed him flip off a patrol unit in the parking lot, get into his truck, and begin "punching the ceiling" of the truck. He then "sped out of the parking lot and down the street," apparently following directions to the district attorney's office.

On February 6, 2023, a motorist reported a hit-and-run incident involving defendant's truck. The truck was "tailgating" him and the driver gave him the middle finger. At one point, the victim's car was in the left lane and the truck was next to it in the right lane. The truck swerved left, "hit the right front" of the car and damaged it, then

2

drove away without stopping. A passenger from the car identified defendant as the driver of the truck.

Defendant was charged with two counts of brandishing a firearm at a person in a motor vehicle (Pen. Code, § 417.3; counts 1 and 2), possession of an assault weapon (Pen. Code, § 30605, subd. (a); count 3), carrying a loaded firearm in a vehicle (Pen. Code, § 25850, subd. (a); count 4), and misdemeanor hit-and-run driving (Veh. Code, § 20002, subd. (a); count 7). After defendant visited the CHP office and the district attorney's office in an attempt to reclaim his guns, CHP and the district attorney obtained a gun violence restraining order against defendant.

### 2. Counts 5 and 6

In July 2023, defendant walked into the district attorney's office and was greeted by an investigator stationed in the lobby. Defendant "looked angry" and "had a very intense look to his eyes." His brow was furrowed, his jaw was clenched, and he "was speaking louder than normal" with a stern tone of voice. He was holding a piece of paper with something printed on it and told the investigator that he had been "wronged by the State of California and Monterey District Attorney's Office." When the investigator responded with follow-up questions, defendant appeared to get angrier and "began waving his hands wildly about." The investigator suggested that defendant seek legal counsel. Defendant "became more agitated," demanded that the investigator agree his rights had been violated, and left the building angrily.

About an hour later, defendant "reentered the public lobby, appearing more agitated than he was the first time." He again showed the investigator a piece of paper and insisted the investigator affirm "that he had been wronged and that his rights had been violated." Defendant pointed at the piece of paper and said something to the effect that, "if law enforcement ever comes to his house to enforce this order," they should "wear all the body armor that God can afford them." The investigator asked defendant what he meant, at which point defendant "became silent" and "proceeded to leave." As

3

he walked out of the building, defendant told the investigator to "fuck off" and said something to the effect of, "I hope you die in a hole alone or alone in a hole." Defendant was charged with making criminal threats (Pen. Code, § 422, subd. (a); count 5) and resisting an executive officer (Pen. Code, § 69; count 6).

### 3. Defendant's Application for Mental Health Diversion

Defendant applied for mental health diversion in January 2024 (Pen. Code, § 1001.36), which the prosecution opposed. Defendant's application included a psychiatric report. According to that report, CHP officers confiscated defendant's cell phone and two of his guns on the day of his February 2023 arrest. Defendant believed that law enforcement was not entitled to continue holding his property, and he visited both a CHP office and the district attorney's office numerous times trying to reclaim it. When he visited the district attorney's office in July 2023, he told an investigator that "he had a 'slam dunk case' to get his firearms back." Defendant also told the investigator, "who he believed was a Christian, that he was committing a sinful act and that [defendant] was protected by armor."

Defendant reported having been hit in the head with a rock by a classmate when he was 13 years old. He asked the school principal to "press charges" but "nothing was done" and he believed his rights and safety had not been adequately protected. The incident continued to bother defendant. He estimated sleeping only four to five hours per night because his sleep was frequently "interrupted by unpleasant memories" such as the rock assault, which he believed had "almost caused his death." Defendant had not sought formal treatment for his mental health problems because no one had helped him when he was hit with a rock and he did not believe anyone would help him now either.

According to defendant, his parents used drugs while his mother was pregnant with him. Defendant was raised by both parents until they divorced when he was six years old. His parents then shared custody of him until he was 10 years old, when his mother moved to another city. After that, defendant saw his mother about three times per

4

year during breaks in the school calendar. Defendant attended schools that he perceived as "gang ridden" and described being "targeted by gang members" because he was white. He then attended San Jose State University for over four years, but was not on track to graduate within five years. He transferred to another campus in the East Bay, where he was a junior at the time of his arrest and working on a sheep farm. Defendant had "some friends" and was "connected with one of them." He had no romantic relationships.

Defendant believed his mother had been avoiding him and his sister since 2018. He was upset when he learned his mother was pregnant, as he believed she was trying to replace him with a new child. His father had also started a new romantic relationship that produced a child. Defendant felt "betrayed" by his father, who he believed was also trying to replace him. He lived with his father and got along well with his half-sister, but not with his father's girlfriend. They lived in North Monterey County, which defendant described as an "unpleasant environment." Defendant reported having guns brandished at him "12 to 16 times" and being "shot at about three times while driving."

The psychiatrist interviewed defendant's father, who described defendant as "overly emotionally sensitive." Defendant's father said defendant had "been extremely emotional since the divorce," which happened when defendant was eight years old. Defendant holds grudges against his father and "cannot let go of any issue." His father recalled defendant being hit with a rock in school and confirmed that defendant still spoke about the incident frequently. According to his father, defendant had "problems with road rage" but "no history of violence."

Defendant's sister said defendant had never adjusted to their parents' divorce and had refused to seek psychological treatment despite her encouragement. She believed defendant "cannot tolerate actual or imagined rejection" and "obsesses about it." Defendant's mother said she had explained to defendant that she had to move away for financial reasons, and she was not abandoning him, but he did not believe her. She and defendant's father had both encouraged defendant to attend therapy, but he had refused.

5

The psychiatrist diagnosed defendant as having a paranoid personality disorder and a depressive disorder. In the psychiatrist's opinion, defendant's paranoid personality disorder "underlies his behavior in the criminal offenses and his social functioning." Defendant had a "sensitive paranoid personality disorder subtype" and his "primary dysfunction" was "feeling ostracized and alienated." People with disorders of his subtype "perceive that people dislike them" and "interpret the comments and actions of people as rejecting them." They "have difficulty establishing interpersonal relations because they fear being abandoned." The charges against defendant were consistent with his personality disorder in that they stemmed from his perceived mistreatment, and in that defendant "is easily irritated and personalizes trivial situations such as other motorists impeding his driving."

With respect to possible treatment, the psychiatrist opined that defendant's condition was treatable. Although defendant had believed in the past that seeking treatment would be futile, he was "not resistant to treatment." The psychiatrist recommended a minimum of two years of individual or small-group cognitive behavioral therapy, as well as treatment with anti-anxiety and anti-depressant medications. Defendant's "risk of dangerousness to the community" would be "low" if he complied with the treatment plan and was "not allowed to own firearms or have access to them."

### 4. The Prosecution's Opposition and the Court's Ruling

The prosecution argued defendant's diversion request should be denied because he would "pose an unreasonable risk of danger to public safety if diverted" and his proposed treatment plan was too vague. The court agreed that defendant's proposed treatment plan was not fully developed, but said its ruling was "not going to be based on that element" because defendant had not had an opportunity to arrange treatment while in custody. Instead, the court denied defendant's diversion request based on a finding that he would pose an unreasonable risk of danger to public safety if the request were granted.

6

In making its ruling, the court referenced considerations including the facts of the charged offenses; defendant's statement to the court "that he needed his firearms for purposes of self-defense"; the psychiatrist's assessment that defendant "grossly overreacts to everyday interactions and then obsesses over them"; defendant's continuing belief that his rights were being violated and he was entitled to possess guns; and the unpredictability of defendant's behavior.

On the same day his diversion request was denied, defendant then pleaded no contest to counts 3, 4, and 6 in a negotiated disposition. Defendant also admitted he had been convicted of crimes for which consecutive sentences could be imposed. (Cal. Rules of Court, rule 4.421(a)(7).) In the written plea form, defendant had agreed to waive all appellate rights including the right to appeal his "conviction, the judgment, and any other orders previously issued" by the trial court. Defendant and defense counsel confirmed in writing that they had reviewed the form together, and defendant confirmed at the change of plea hearing that he understood its contents. At that hearing, the court stated: "So it is my understanding that as part of the agreement you're giving up your right to federal and state writs and appeals. That includes, but is not limited to, your right to appeal the conviction, the judgment and any other orders issued by this court. [¶] Do you give up your right to appeal the conviction?" Defendant answered, "Yes."

The remaining charges were dismissed and the court ultimately placed defendant on two years' probation, including conditions that defendant take all psychotropic medications prescribed by his healthcare provider; undergo assessment and treatment by Monterey County Behavioral Health; participate in counseling programs deemed necessary by the court or probation officer; and complete an "assaultive behavior program" within one year. After the court placed defendant on probation, it granted a certificate of probable cause relating to its denial of the request for mental health diversion.

7

## II.    DISCUSSION

Defendant argues the trial court abused its discretion in denying mental health diversion under Penal Code section 1001.36 (unspecified statutory references are to the Penal Code). (See *People v. Graham* (2024) 102 Cal.App.5th 787, 795 [ruling on diversion request reviewed for abuse of discretion].) That statute allows trial courts to grant pretrial diversion to qualifying defendants. (§ 1001.36, subd. (a).) As relevant here, one requirement is that the defendant will "not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community." (§ 1001.36, subd. (c)(4).) Section 1170.18 defines "unreasonable risk of danger to public safety" as an unreasonable risk that the defendant will commit one of certain enumerated violent felonies such as homicide, attempted homicide, or assault with a machine gun on a peace officer. (§ 1170.18, subd. (c); see § 667, subd. (e)(2)(C)(iv).) In determining diversion eligibility, courts "may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate." (§ 1001.36, subd. (c)(4).)

We are not persuaded by defendant's position for two reasons. First, we agree with the Attorney General that defendant waived his right to challenge the trial court's ruling on appeal. Appellate waivers contained in plea agreements are generally enforceable if entered knowingly, intelligently, and voluntarily. (*People v. Panizzon* (1996) 13 Cal.4th 68, 80.) Here, as part of his negotiated plea, defendant agreed to waive appellate rights including his right to appeal any orders issued by the trial court before the time of the plea. The trial court's order denying his diversion request falls within the scope of that waiver.

Defendant contends his waiver of the right to challenge the denial on appeal was not knowing, intelligent, or voluntary because the trial court asked him only whether he would waive his "right to appeal the conviction" and the court later issued a certificate of

8

probable cause relating to the diversion request. But both the written plea form and the court's oral advisement at the change of plea hearing were clear that defendant was "giving up your right to federal and state writs and appeals. That includes, but is not limited to, your right to appeal the conviction, the judgment and any other orders issued by this court." (Cf. *People v. Vargas* (1993) 13 Cal.App.4th 1653, 1662 ["general waiver of the right of appeal did not include error occurring after the waiver because it was not knowingly and intelligently made"].) That the trial court later issued a certificate of probable cause does not suggest defendant's waiver was not knowing, intelligent, and voluntary at the time it was made. Nor does the certificate of probable cause itself invalidate the waiver. (See *People v. Espinoza* (2018) 22 Cal.App.5th 794, 803 [certificate of probable cause allows defendant to *argue* waiver is not enforceable on appeal]; *People v. Shults* (1984) 151 Cal.App.3d 714, 719 ["the issuance of a certificate of probable cause does not operate to enlarge the grounds on which an appeal may be taken"].)

Even assuming the unenforceability of defendant's appellate waiver with respect to the issue, we see no abuse of discretion in the trial court's denial of diversion. The essence of defendant's argument is that because the court went on to place defendant on probation (which would entail his treatment in the community), it could not have reasonably determined that he would "pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community." (§ 1001.36, subd. (c)(4).) We disagree that denying mental health diversion yet granting probation inherently constitutes an abuse of discretion. (See *People v. Pacheco* (2022) 75 Cal.App.5th 207, 214 (*Pacheco*) [affirming denial of mental health diversion based on unreasonable risk of danger to public safety because "diversion may provide some motivation for remaining drug free and compliant with treatment for mental illness" but felony probation and the threat of prison "will provide even more motivation"].)

9

Defendant urges us to reject *Pacheco* in favor of the reasoning in *People v. Whitmill* (2022) 86 Cal.App.5th 1138 (*Whitmill*). We do not read *Whitmill* as inconsistent with *Pacheco*, and it is distinguishable from this case. Whitmill experienced a substance abuse relapse following a relative's cancer diagnosis and "negligently fired a single shot in the air away from those nearby and then threw the gun away and turned himself in … with 'no incident.' " (*Whitmill*, at pp. 1151–1152, 1155.) The trial court denied his request for mental health diversion based in part on the fact that he had previously received a suspended sentence, stating: " '[W]hat I have here is a defendant who had three years in the county jail suspended. And that's designed to create a strong disincentive to commit any new crime. That does not give me great confidence.' " (*Id.* at p. 1155.) The *Whitmill* court accepted the *Pacheco* court's premise that diversion may be less motivating than felony probation, but noted that the theory "would necessarily apply in every case in which diversion is under consideration and, if applied in every case, moot the statute." (*Ibid*.) The court went on to explain that Whitmill's actions in "running away from further confrontation, throwing away his firearm, and peacefully complying with law enforcement's request that he come forward and (presumably) be arrested" presented an "unusual scenario" under which it could not be concluded he was "likely to commit a super-strike offense in the future." (*Id.* at p. 1151.)

Defendant presents no such "unusual scenario." Quite the contrary, over a period of several months, he brandished a gun in multiple road rage incidents; repeatedly confronted law enforcement for the purpose of reclaiming his guns, including an assault rifle; and made comments that were reasonably interpreted as threatening gun violence against law enforcement. His repeated conduct provides substantial evidence to support the trial court's conclusion that he would pose an unreasonable risk of danger to public safety if granted mental health diversion and treated in the community. (Cf. *Whitmill*, *supra*, 86 Cal.App.5th at p. 1155 [where defendants *do not pose an unreasonable risk of danger to public safety* and are not otherwise ineligible or unsuitable for diversion,

10

"courts cannot override that determination just because a grant of probation in the past has not 'motivated' defendants to overcome symptoms of mental illness which contribute to violations of the law"].)

Defendant has validly waived his right to challenge the trial court's denial of mental health diversion on appeal. But even considering the merits of his appeal, the trial court reasonably exercised its discretion to deny diversion on this record.

### III.    DISPOSITION

The judgment is affirmed.

_____
Grover, J.

**WE CONCUR:**

_____
Greenwood, P. J.

_____
Wilson, J.

H051993
*The People v. Montgomery*